J-A14036-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF I.G.D. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 78 WDA 2021 |

Appeal from the Order Entered December 31, 2020
In the Court of Common Pleas of Fayette County Orphans' Court at
No(s):  31-ADOPT-2020

BEFORE:  MURRAY, J., KING, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                **FILED: September 9, 2021**

T.D. ("Father") appeals from the Order denying his Petition to involuntarily terminate the parental rights of A.O. ("Mother") to I.G.D. ("Child") (a female born in August 2016), so that his wife, A.D. ("Stepmother"), may adopt Child.[1]  We affirm.

Mother and Father were never married, but they resided together until March 2017.  Following their separation, Father initiated a custody action on

_____

[1] No petition for adoption appears in the certified record.

March 22, 2017.[2, 3]  Following several filings and modifications, the trial court entered a Temporary Modified Custody Consent Order on July 20, 2017. Pursuant to that Order, parties shared legal custody; with Mother having primary physical custody and Father having partial physical custody in accordance with a custody schedule.[4]  On January 8, 2018, the trial court

---

[2] After Mother and Father separated, Mother remained in the home with Child, and Father moved in with his parents.  *See* N.T., 11/16/20, at 22, 27-28. Father believed the living arrangement would be in Child's best interest.  *See id.* at 22.  Ultimately, Father evicted Mother from the home in August 2017, so he could reassume possession of the home.  *See id.* at 22, 28, 69.

[3] Following an incident in June 2017, Father filed a Protection From Abuse ("PFA") Petition against Mother.  N.T., 11/16/20, at 31.  Specifically, Father went to Mother's house for a custody exchange, and Mother became hostile, claiming that Stepmother was "tagging" her in pictures on Facebook.  *Id.* When Father turned to leave, Mother threw a bottle at the side of Father's truck and threatened Father.  *Id.*  Father called the police, but no police report was filed.  *Id.* at 31-32.  The trial court denied the PFA Petition.  *Id.* at 32.

Father also filed a PFA Petition against Mother in Fall 2017, following a custody exchange that was supposed to take place at Fox's Pizza Den.  *Id.* Father explained that Mother "flipped his wife off and started calling her out of the vehicle", telling Stepmother "get out of the car, b----," "I'm going to kick your f------ ass."  *Id.* at 33; *see also id.* at 83 (wherein Mother recounted the same event).  Father testified that he and Stepmother filed a police report, and the police filed harassment charges against Mother.  *Id.*  Mother was found guilty of harassment.  *Id.*

[4] Mother filed a PFA Petition against Father at the end of 2017, alleging that Father and Stepmother taunted her during custody exchanges.  N.T., 11/26/20, at 107-08.  The trial court entered a temporary PFA Order, which was in effect for approximately 6 months.  *Id.* at 108.  During that time, custody exchanges were moved from Mother's house, to Fox's Pizza Den (which had surveillance cameras), and ultimately, to the police station.  *Id.*

entered an Order directing the parties to share physical custody on an equal basis, and restricting Mother's visits with Child to her home.[5]

In early May 2018, Mother and Child were residing with Child's maternal grandmother, D.H. ("Maternal Grandmother"). Child, left unattended, fell down a flight of steps and sustained a bloody nose. Mother and Maternal Grandmother began to fight. Maternal Grandmother called the police, after which Mother called Father and asked him to pick up Child from her home. On May 9, 2018, Father filed an Emergency Petition for Special Relief, requesting suspension of Mother's visitation, and citing concerns with Mother's ability to parent Child.[6] By an Order entered on May 11, 2018, the trial court suspended Mother's visitation as to Child.[7]

On July 6, 2020, Father filed the Petition for involuntary termination of Mother's parental rights pursuant to 42 Pa.C.S.A. § 2511(a)(1) and (2). On that same date, Father also filed an Addendum to the Petition, attaching

---

[5] During the custody proceedings, the trial court ordered both parents to submit to a drug test. N.T., 11/16/20, at 121-22. Mother's hair test from January 11, 2018, was positive for marijuana. *Id.* at 122-23.

[6] In the Emergency Petition, Father cited concerns about Mother's illegal drug use and erratic behavior; threats made against Mother by third parties; and the incident in which Child fell down steps and sustained a bloody nose. *See* Exhibit B (Emergency Petition for Special Relief); N.T., 11/16/20, at 72 (wherein Exhibit B was admitted into evidence). Additionally, Father testified that a police officer informed him of an incident in which Child had been in a car with an unlicensed driver. N.T., 11/16/20, at 12.

[7] Custody has not been modified since this date.

Child's birth certificate. On November 16, 2020,[8] the trial court held an evidentiary hearing on the Petition, at which Father and Stepmother were present with Father's counsel, Wendy L. O'Brien, Esquire; Mother was present with her counsel, Sharon K. Smith, Esquire; and Michelle L. Kelley, Esquire, was present as Child's guardian *ad litem* ("GAL")/legal interest counsel.

Father testified that he resides in Uniontown, Pennsylvania, with Stepmother, Stepmother's nineteen-year-old daughter, E., and Child. N.T., 11/16/20, at 6. Father works as a welding instructor at Fayette County Career Technical Institute. *Id.* at 7. Father and Stepmother married in May 2018. *Id.* at 8. Child has resided full time with Father and Stepmother since the May 11, 2018, Custody Order. *Id.* at 10-11, 13.

Father testified that he has not had any contact with Mother since the entry of the May 11, 2018, Custody Order. *Id.* at 14; *see also id.* at 14-15 (wherein Father explained that Child has not received any cards or presents from Mother, nor has Mother called or emailed Father in order to contact Child). Father indicated that there was the exception of one message on his telephone that he assumed was from Mother, left on Child's birthday in August of 2019, stating she was calling to wish Child a happy birthday. *Id.* at 15-16. *But see id.* at 53-56 (wherein Father conceded that Mother contacted him

---

[8] The trial court admitted the July 20, 2017, Custody Order as Respondent's (Mother's) Exhibit 1, on agreement of the parties, and stated that it would take judicial notice of the custody case record. N.T., 11/16/20, at 37-39.

about Child in June 2018). Father agreed that he and Mother have a bad relationship, which has made communication between them difficult. *Id.* at 60-61. Father denied preventing Mother from contacting him to schedule visitation with Child.[9] *Id.* at 20-21; *see also id.* at 21 (wherein Father testified that he did not recall being asked to schedule visitation following the entry of the Custody Order), 53 (same), 63 (wherein Father indicated that he told the court in the custody action that Child had ingested tobacco, while in Mother's care, and that he contacted Children and Youth Services about the incident).[10] Father also testified that Mother has not provided Father with any financial support for Child. *Id.* at 23.

Father stated that, prior to May 2018, Child had multiple respiratory infections, and that Child's pediatrician ordered that Child not be around any type of cigarette smoke. *Id.* at 16; *see also id.* (wherein Father testified that Child used a nebulizer). He stated that Child had multiple incidents of diaper rash when she returned to him from Mother in custody exchanges, and Child would smell like cigarette smoke and have respiratory infections. *Id.* at 16,

_____

[9] Father kept track on a calendar, circling the dates that he had overnight custody of Child between January 2018 and April 20, 2018. N.T., 11/16/20, at 67-68, 72; Petitioner's Exhibit C. The calendar reflected that Mother had diminishing visits with Child beginning in early January 2018. N.T., 11/16/20, at 66-67. On some exchange occasions, Mother did not pick up Child or she showed up hours late. *Id.* at 67.

[10] This incident was investigated, but did not become part of the record in the custody proceedings. N.T., 11/16/20, at 41.

- 5 -

42-43. Further, prior to May 2018, Mother provided medical insurance to Child through public assistance. *Id.* at 17. At some time after May 2018, Father received a bill for unpaid medical expenses for Child, and discovered that Child had been removed from Mother's health care coverage. *Id.* Father testified that since Child has been his custody, Child has not had any medical problems, no longer uses the nebulizer, and does not have asthma symptoms. *Id.* at 16-17.

Father testified that, at the time of the hearing, Child was attending preschool at a learning center three days a week. *Id.* at 7. Prior to the pandemic, Child had been attending five days a week; Stepmother then began working from home. *Id.* Father testified that Child is on track for a normal 4-year-old. *Id.* at 20; *see also id.* (wherein Father explained that Child can identify colors, count to 20, and recite the Pledge of Allegiance).

In addition to Child, Father has three sons: T., age 29; Co., age 27; and Ch., age 25. *Id.* at 17-18. T. resides in Hopwood, Pennsylvania, and Co. resides in Uniontown, Pennsylvania, near Father's home.[11] *Id.* at 18. Paternal Grandfather, R.D., ("Paternal Grandfather") and Paternal Grandmother, N.D. ("Paternal Grandmother"), live near Father in McClellandtown, Pennsylvania. *Id.*; *see also id.* at 14 (wherein Father stated that Paternal Grandfather is very involved with Child). Child has a very good relationship with Father's

---

[11] Father did not testify to where Ch. resides.

family. *Id.* Further, Father testified that Child has a close relationship with Stepmother, who has cared for Child since the May 11, 2018, Custody Order. *Id.* at 19.

Upon questioning from the trial court, Father explained that he filed the termination Petition to ensure that, if something would happen to him, Child's stability would not be interrupted, and he believed a long period of time had passed without Mother attempting to gain custody or provide financial support for Child. *Id.* at 77-79.

Stepmother testified that she lives with E.,[12] Father, and Child. *Id.* at 79-81. Stepmother first met Child when Child was 8 months old. *Id.* at 80. Stepmother testified that, in the three years preceding the hearing, she has never spent a twenty-four-hour period without Child. *Id.* Stepmother has never known Mother to be involved in Child's life. *Id.* at 81. Mother has not contacted Stepmother since Mother's visitation rights were suspended. *Id.* at 82; *see also id.* at 95 (wherein Stepmother testified that Mother has not had

---

[12] Stepmother has three biological children: Ji., a 26-year-old male; Jo., a 23-year-old male; and E. *Id.* at 93.

any involvement with Child in the past three years).[13]  Stepmother described

Father's and Mother's relationship as "rocky."  *Id.* at 83.  Further, Stepmother

testified that Father has a great relationship with Child, and that she and

Father have made sacrifices to ensure that Child has a stable environment and

all of her needs are met.  *Id.* at 90.

Stepmother has seen a change in Child's health since Child has been in

Father's primary physical custody.  *Id.* at 86.  Stepmother explained that,

when she first met Father, they spent numerous nights at Children's Hospital

and Uniontown Hospital Emergency room, and they were told Child had

reactive airway disease caused by second-hand cigarette smoke.  *Id.*  Since

Child has been in Father's primary physical custody, Child has not had any

respiratory infections, bronchitis or allergies, and has not gone to the hospital.

*Id.*

Stepmother stated that she taught Child to walk and talk, and that Child

was developmentally delayed.  *Id.* at 85; *see also id.* at 90 (wherein

Stepmother stated that Child was developmentally delayed until Stepmother

worked with her).    Stepmother testified that Child was going into

---

[13] Stepmother cited one occasion when Mother saw E. while E. was shopping. N.T., 11/16/20, at 96-97.  Mother chased and harassed E., and E. locked herself in her vehicle.  *Id.* at 96-97.  Father and Stepmother attempted to obtain a PFA order against Mother, but were unsuccessful because E. was not related to or sexually involved with Mother.  *Id.* at 96.  Father and Stepmother also attempted to obtain a restraining order against Mother, but were unsuccessful because Mother had left the scene before police arrived.  *Id.* at 97.

kindergarten, and she is very intelligent. *Id.* at 90. Stepmother added that Child knows the alphabet and the Pledge of Allegiance, and that Child loves to sing and play. *Id.*

Stepmother further testified that her extended family loves Child. *Id.* Stepmother's older sister, who resides in Maryland, lives approximately 40 minutes from Stepmother. *Id.* She has a daughter who is Child's age and is Child's best friend. *Id.* E. also loves Child and would do anything for her. *Id.* at 89-90.

Mother testified that she currently resides in an apartment in Cardale, Pennsylvania. *Id.* at 102. Mother is employed as a home health aide for two different companies, and travels to the homes of individual clients to provide care. *Id.* at 102-03; *see also id.* at 129 (wherein Mother stated that she stopped visiting clients' homes in February or March 2020). Mother works approximately 47 hours a week. *Id.* at 103. At the time of the termination hearing, Mother earned $10.10 per hour at one job, and $9.50 per hour at her second job. *Id.* at 121. Mother also has background checks and holds non-child clearance to work in her field. *Id.* at 103-04.

Mother stated that from the time she and Father ended their relationship until May 2018, Father confronted her several times about various matters. *Id.* at 107. Mother testified that when she had Child in her custody, she always had a good relationship with Child. *Id.* at 110-11. Mother stated that she was bonded with Child. *Id.* at 111. According to Mother, Father uses

Child to hurt her. *Id.* Mother also testified that she has contacted Father between May 2018 and the termination hearing, but that she got no response from phone calls or text messages, and was blocked from Father's social media.[14] *Id.* at 125, 131-32. Mother testified that during the 6-month period prior to the filing of the termination Petition, she sent text messages and called Father, asking how Child was doing and unsuccessfully requesting a photograph of Child. *Id.* at 142; *see also id.* at 143 (wherein Mother stated that she most recently sent a text message to Father 2-3 months prior to the hearing (after the termination Petition had been filed), and periodically sent message before the Petition was filed).[15] Mother stated that she had considered filing a custody complaint but could not afford an attorney. *Id.* at 125-26, 142-43.

Mother had enrolled Child in Head Start to help with Child's development, education and testing. *Id.* at 114-15; *see also id.* at 115

---

[14] In rebuttal, Father testified that he blocked Mother from his Facebook account because she had hacked into his account and deleted all of his friends; he also had received harassing messages from Mother. N.T., 11/16/20, at 149, 151.

[15] In rebuttal, Father denied that Mother periodically sends text messages concerning Child. N.T., 11/16/20, at 146. According to Father, he only received one text message from Mother, approximately one month prior to the termination hearing. *Id.* at 147. Father testified that the last telephone call he had received from Mother was on Child's birthday in 2019. *Id.* at 147-48. Additionally, Father testified that Mother refused to provide her contact number during the custody proceedings. *Id.* at 148.

(wherein Mother testified that Child had been screened by a physician, who found no deficits). Child earned a two-year certificate of completion in May 2018. *Id.* at 116-18. According to Mother, Father would not allow Child to continue with the Head Start program. *Id.* at 117.[16]

Mother conceded that she has not seen Child since May 2018, following the incident in which Child was hurt, and Mother and Maternal Grandmother fought. *Id.* at 104-05. Mother testified that she asked Father to pick up Child because Maternal Grandmother had called the police, and Mother was unsure whether the situation would become violent. *Id.* at 105-06.

When Mother moved out of Maternal Grandmother's home in May 2018, she lived with a friend, D.S., for a few months. *Id.* at 119-20, 134. Mother testified that she would not have taken Child to live with D.S., because D.S. lives "differently" than what Mother would "approve of." *Id.* at 119-20, 134. When Mother left D.S.'s home, she resided with different friends. *Id.* at 120. In February of 2019, Mother rented her own place for a few months, but the landlord lost possession of the house, and she was evicted. *Id.* Mother then moved in with her father for six or seven months before moving to her current

---

[16] The trial court stated that the weight which would be given to the testimony and documents concerning Head Start was questionable, as the focus of the termination proceedings was on whether the evidence demonstrated that Mother had a settled purpose of relinquishing her parental rights *after* May 2018. N.T., 11/16/20, at 116-17.

address. *Id.* Mother has been living at her current address since that time. *Id.*

Mother has another biological son, D., who is 14 years old. *Id.* at 123. D. has been in Maternal Grandmother's custody for the past 10 years. *Id.* at 135-36. Mother believes that D. should not be shut out of Child's life. *Id.* at 123. She stated that D. has asked her to do whatever possible so that he can see Child.[17] *Id.*

Regarding Child's health insurance coverage, Mother testified that Child could not be covered under her medical insurance because Child was no longer in her care. *Id.* at 124. Mother had medical coverage through welfare, but was scheduled to have medical coverage through her employer beginning in January 2021. *Id.* at 124-25.

Mother testified that she loves and misses Child, and she cannot wait to see Child. *Id.* at 126; *see also id.* at 135-37 (wherein Mother stated that she did not intend to permanently relinquish Child in May 2018, but rather, asked Father to temporarily help her due to the situation at Maternal Grandmother's home). Mother believed that Child's life will be disrupted if Child is returned to her, but she stated that it was unfair that Child was removed from her. *Id.* at 126. Mother stated she believes Father has

---

[17] Father testified that D. was in Maternal Grandmother's custody, and that he maintained contact with Maternal Grandmother so Child could have a relationship with her half-brother. N.T., 11/16/20, at 53.

provided for Child's needs since May 2018. *Id.* Mother is ready in her career and living situation to have any type of custody of Child, and she has been working toward Child's return to her custody. *Id.* Mother testified that Father never provided her with any hint or notice over the course of these last two years that he would be seeking the termination of her parental rights. *Id.*

Mother has previously been convicted of or pled guilty to simple assault, resisting arrest, and disorderly conduct. *Id.* at 139. Mother has also been convicted of possession of marijuana and cocaine, arising out of an incident in 2011 or 2012. *Id.* At the time of the termination hearing, Mother was not on court supervision, probation, parole, or house arrest. *Id.* at 139-40.

On December 31, 2020, the trial court issued an Order denying Father's Petition for involuntarily termination of Mother's parental rights as to Child. Father filed a timely Notice of Appeal. On that same date, the trial court entered an Order directing Father to file a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), within 21 days. Father timely complied.[18]

On appeal, Father raises the following issues for our review:

1. Whether the trial court erred and/or abused its discretion by failing to terminate the parental rights of Mother … pursuant to 23 Pa.C.S.A. § 2511(a)(1)[,] where Mother has failed to perform any

---

[18] *See In re K.T.E.L.*, 983 A.2d 745, 748 (Pa. Super. 2009) (finding that the appellant's failure to simultaneously file a concise statement pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) did not result in waiver of all issues for appeal where the appellant later filed the concise statement, and there was no allegation of prejudice from the late filing).

parental duties in excess of six months immediately preceding the filing of the Petition for Involuntary Termination of Parental Rights?

2. Whether the trial court erred and/or abused its discretion by failing to terminate the parental rights of Mother … pursuant to 23 Pa.C.S.A. § 2511(a)(1), where Mother had evidenced a settled purpose of relinquishing her parental rights for a period of time in excess of six (6) months immediately preceding the filing of the Petition for Involuntary Termination of Parental Rights?

3. Whether the trial court erred and/or abused its discretion in failing to terminate the parental rights of Mother … pursuant to 23 Pa.C.S.A. § 2511(b), in consideration of the needs of the minor [C]hild including intangibles such as love, comfort, security, and stability?

4. Whether the trial court erred and/or abused its discretion by failing to terminate the parental rights of Mother … pursuant to 23 Pa.C.S.A. § 2511(b)[,] where the evidence demonstrated that Mother and Child have no bond and the Child has lived away from Mother for the most part of her life and Mother made no effort to maintain a bond with the Child?

5. Whether the trial court erred and/or abused its discretion by permitting testimony of the corrective measures th[at] Mother … alleges have occurred since the filing and service of the Petition of Involuntary Termination of Parental Rights?

6. Whether the trial court erred and/or abused its discretion in permitting Mother … to testify regarding her parenting involvement and alleged efforts to maintain contact with the child, beyond the six (6) months immediately preceding the filing and service of the Petition for Involuntary Termination of Parental Rights?

Father's Brief at 5-7 (issued renumbered).

We will address Father's first four claims together. Regarding section 2511(a)(1), Father claims that Mother has not seen or contacted Child since June 2018, long before the 6 months prior to the filing of the termination

- 14 -

Petition. *Id.* at 17-18. Father also argues that Mother has not provided Child with support or gifts, nor has Mother been involved with Child's schooling, medical visits, or emotional growth since that time. *Id.* Father asserts that, despite Mother's claim that she was unable to afford an attorney to challenge the May 11, 2018, Order, Mother was employed at that time. *Id.* at 21; *see also id.* (wherein Father suggest that Mother could have filed a *pro se* petition for modification). Additionally, Father points out that he could have filed the termination Petition six months after the May 11, 2018 Order, but waited over two years, "having given Mother more than sufficient time to step up and correct her issues…." *Id.* at 23-24. Father claims that Child is bonded with him and Stepmother, and that Stepmother is the only mother Child knows. *Id.* at 28-29.

Regarding section 2511(b), Father contends that "Mother has been absent for more than half of [Child's] life. Mother admitted during her testimony that she decided to 'give' [Child] to Father, because she knew [Child] would 'be okay there.'" *Id.* at 31. Father claims that Mother has not provided for Child's basic needs, and that he and Stepmother provide for Child's security, stability, love, and comfort. *Id.* at 32; *see also id.* (stating that "Mother has allowed herself to become a stranger to [Child]."). Father argues that Child does not have a bond with Mother, as Mother has not been in her life in two years. *Id.* at 34-35. On the other hand, Father asserts that

Stepmother loves Child as her own, and "has provided for every single need that [Child] has ever had since she was one year old." **Id.** at 36-37.

We adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> …[U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

**In re Adoption of S.P.**, 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. **In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and

convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), along with consideration of section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will address section 2511(a)(1) and (b), which provides as follows:

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> * * *
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

With respect to subsection 2511(a)(1), our Supreme Court has held as follows:

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988).

Further, this Court has stated that

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 854-55 (Pa. Super. 2004) (citations omitted).

Further, "a parent has an affirmative duty to love, protect and support h[er] child and to make an effort to maintain communication with that child."

*Adoption of S.P.*, 47 A.3d at 828 (citation omitted).

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23

- 18 -

Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances … where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

[C]oncluding [that] a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. … Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the

- 19 -

development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of … her child is converted, upon the failure to fulfill … her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d at 856 (internal citations omitted).

This Court has explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. It is well settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

In its Pa.R.A.P. 1925(a) Opinion, the trial court addressed Father's first two issues, regarding section 2511(a)(1), as follows:

> Several of [Father's] assertions in the Concise Statement appear to be generic boilerplate assertions that the trial court "erred and/or abused its discretion" with regards to Mother's

- 20 -

fulfillment of parental duties and Mother's alleged "settled purpose" of relinquishing parental rights for a period of time." [*sic*] On these issues, the [c]ourt will rely on the testimony of record[,] which as a whole supports each of the challenged conclusions that this [c]ourt has reached.

Other issues raised by [Father] assert matters of credibility. [Father] raised the assertion that the trial court erred in permitting testimony of the corrective measures Mother alleges to have occurred. While Mother may not have been fulfilling a parental role in the past, the fact that corrective measures have been taken shows Mother's inclination to right past wrongs with regards to her relationship with her [C]hild. The court found that these corrective measures were taken in good faith and believes that the establishment of a relationship with Mother is in the [C]hild's best interests. Likewise, the court finds [] Mother's testimony regarding her involvement in parenting and efforts to maintain contact with the [C]hild to be credible. [Father] also raises the issue of the needs of the minor [C]hild, specifically intangible needs such as love, comfort, security, and stability. The court finds that continued relationship with Mother would be in keeping with all those intangibles which are so important to a young child.

....

Lastly, [Father] raises the issue that the [C]hild, [*sic*] has lived apart from Mother for much of her life and alleges that there is "no bond". The court relies upon a recent Fayette County case wherein [the trial c]ourt affirmed the decision of the lower court and found no abuse of discretion in concluding [the] father's failure to maintain any association with the child for four[-]and[-]a[-]half years did not warrant a termination of his parental rights. Although the statutory factors of Section 2511(a)(1) were met, the Orphan's Court concluded termination would not be in the best interest of the child[,] as required by 23 Pa.C.S.[A.] § 2511(b). *In re Adoption of N.M.T.*, 1353 W.D.A. 2019 [(Memorandum filed July 7, 2020) (2020 Pa. Super. Unpub. LEXIS 2159) (Non-precedential decision. *See* Superior Court Internal Operating Procedure ("I.O.P.") Rule 65.37.)]

With the utmost attention to the effect on the [C]hild of permanently severing the bond with [M]other, we likewise find that [Father] has not met the clear and convincing standard to establish termination would be in the [C]hild's best interest. We

also note that no expert testimony was presented to assist the court in this regard by [Father,] nor did the [GAL] recommend a finding that termination was in the [C]hild's best interest.

We are mindful that the "termination of parental rights is a drastic measure that should not be taken lightly. Not only are [the parent's] rights at stake here, but [the child's] right to a relationship with [his or her parent] is also at stake." *In re: K.G.M.*, 845 A.2d [861, 864-65 (Pa. Super. 2004)] (citing *In re: Stickley*, 638 A.2d 976, 980 (Pa. Super. 1994)). In light of the foregoing, we find a court-ordered termination of Mother's parental rights to be contrary to the best interests of the [C]hild.

Trial Court Opinion, 2-5 (emphasis in original).

After careful review of the testimonial and documentary evidence in this matter, we discern no abuse of discretion or error of law on the part of the trial court in concluding that Father failed to satisfy his burden of proof under section 2511(a)(1). There is competent evidence in the record, in the form of Mother's testimony and admitted exhibits, that supports the trial court's findings. Mother's evidence, which the trial court believed, supports a finding that Father and Stepmother have not acted cooperatively with Mother regarding her exercise of custody of Child. Rather, Petitioners have created obstacles for Mother maintaining her previous custody of Child. In particular, Father obtained the May 11, 2018, Order suspending Mother's exercise of partial custody, including visitation, of Child, after Mother had contacted Father and asked him to take Child for what she believed would be a temporary period of time. As we stated above, "even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court

and impose its own credibility determinations…." ***Adoption of S.P.***, 47 A.3d at 826-27. Thus, we find Father's challenges regarding section 2511(a)(1) lack merit.

Additionally, there is competent evidence in the record, in the form of Mother's testimony and admitted exhibits, that supports the trial court's refusal to terminate Mother's parental rights under section 2511(b).[19] Mother's evidence, which the trial court credited, supported a finding that Father and Stepmother have not acted cooperatively with her regarding her exercise of custody of Child. Indeed, by refusing to allow Mother to visit with Child, even obtaining a court Order to preclude her from exercising any form of partial custody, including visitation, Father's and Stepmother's actions have damaged any bond Mother had with Child that presumably grew from her having primary physical custody for the first year and nine months of Child's life. ***See In re: T.S.M.***, 71 A.3d at 267. We emphasize that, while Father complains that it was improper for the trial court to presume that Mother had a bond with Child prior to May 2018, the trial court noted that Father did not present any expert testimony regarding the section 2511(b) considerations.

---

[19] Although we need not analyze section 2511(b), since there is competent evidence to support the trial court's determination that Father did not satisfy section 2511(a)(1), we will do so in an abundance of caution.

Father's Brief at 45-46; Trial Court Opinion, 2/10/21, at 5.[20]  Additionally, the trial court pointed out that the GAL/legal interest counsel for Child recommended that the termination of Mother's parental rights would not be in Child's best interest.  Trial Court Opinion, 2/10/21, at 5.  Thus, Father's challenges concerning section 2511(b) lack merit.

We will address Father's fifth and sixth claims together.  Father contends that the trial court improperly considered corrective measures taken by Mother *after* the filing of the termination Petition.  Father's Brief at 37.  According to Father, Child does not recognize Mother as a parent, and permitting Mother to retain parental rights would subject Child to "a state of proverbial limbo."  *Id.* at 38-39.  Father asserts that the trial court "rel[ied] on a factual finding that is contrary to the law…"  *Id.* at 40.  Additionally, Father argues that the GAL's recommendation, upon which the trial court

_____

[20] In this matter, there was evidence, which the trial court found credible, that Father took the Child away from Mother, with whom Child had always lived, at Mother's request.  Father subsequently prevented Mother from communicating with Child and he would not communicate with Mother, and then Father claimed that there was no bond between Mother and Child.  The trial court reasoned that Father failed to support his claim regarding the lack of a bond with any expert bond testimony.  This is distinguishable from our case law, which has held that a social worker or caseworker can testify about the bond between the parent and the child, and that expert testimony is not always needed.  **See In re Z.P.,** 994 A.2d at 1121.  Here, we have directly interested parties, Father and Stepmother, who testified that there is no bond between Mother and Child.  It is clear that the trial court found their testimony was incredible, and cited Father's failure to present any expert testimony regarding the bond to provide support for his own testimony and that of Stepmother.

relied, is "riddled with incorrect information, not supported by the record, and erroneous misstatements of the law." *Id.* at 44.

To the extent that the trial court commented in its Rule 1925(a) Opinion that Mother has been working toward becoming a better mother for Child and has made attempts to have contact with Child, these observations do not constitute reversible legal error. As we observed, *supra*, this Court has instructed that

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d at 854-55. The trial court considered this instruction in its Opinion. *See* Trial Court Opinion, 2/10/21, at 4.

Further, Father attempts to discredit the GAL/legal interest counsel's recommendation by pointing out that it includes an error as to Child's age. The recommendation, however, appears to simply have a typographical error, stating that Child was born in August 2006 instead of August 2016. GAL/legal interest counsel never states that Child is sixteen years old. *See* Father's Brief at 43-44; Appendix E (Recommendation of GAL/legal interest counsel). There is no indication in the recommendation that the GAL/legal interest counsel was proceeding under an understanding that Child is a teenager rather than a young child.

Accordingly, we affirm the Order denying Father's Petition to involuntarily terminate Mother's parental rights to Child.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  9/9/2021